UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANE DOE 3,

                Plaintiff,

-against-

DARREN K. INDYKE and RICHARD D. KAHN in their capacities as co-executors of the Estate of Jeffrey Edward Epstein,

                Defendants.

24-cv-2192 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

    Jane Doe 3, a victim of Jeffrey Epstein's abuse, sues Darren K. Indyke and Richard D. Kahn in their capacities as the executors of Jeffrey Epstein's estate. Defendants move for partial summary judgment. For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

    Doe is a 43-year-old ▇▇▇▇ citizen. 24-CV-1204, Dkt. 315 ¶ 128. In December 2013, when she was 32 years old, Doe's "career mentor," ▇▇▇▇▇▇▇▇, suggested that Doe meet Epstein. *Id.* ¶ 129; Dkt. 255-51 at 54. On January 1, 2014, Epstein emailed Doe, suggesting that they speak over Skype. Dkt. 315 ¶ 131. A few days later, Epstein invited Doe to meet with him in New York. *Id.* ¶ 132.

    Doe arrived in New York City on January 7, 2014, and stayed for five days in one of Epstein's apartments. *Id.* ¶¶ 134–35. Doe says that during this trip she was forced to watch another victim perform oral sex on Epstein and that Epstein sexually assaulted Doe. Dkt. 331 ¶ 303.

    A week later, Epstein invited Doe to meet with him in Paris and stay in one of his guest rooms; although Doe went to Paris for a few days, Epstein ultimately did not meet her there because he was sick. Dkt. 315 ¶¶ 137, 140, 141, 144.

    On February 11, 2014, Doe returned to Paris for three days and stayed in Epstein's apartment. *Id.* ¶¶ 147–49. Doe alleges that Epstein sexually assaulted her during this visit. Dkt. 331 ¶ 304.

    A few days later, Epstein wrote to Doe, asking whether she could suggest anyone to work as his assistant. Dkt. 315 ¶ 151. Doe responded that she "would . . . love to work for [Epstein] until [she] g[o]t a job that is in line with [her] career." *Id.* ¶ 152.

    On March 5, 2014, Doe returned to New York, and on the following day, traveled with Epstein from New York to the U.S. Virgin Islands. *Id.* ¶¶ 154–55. While there, Doe says that Epstein

forcibly touched her breast, held her down, and "attempted to force Doe to have multiple orgasms on the floor of a secluded room." Dkt. 331 ¶¶ 305–06.

Doe returned to New York from the USVI on March 12, 2014. Dkt. 315 ¶ 158. At some point in the next few days, she says that Epstein digitally penetrated her against her will in the backseat of a car and tried to force her to give him oral sex in his townhouse. Dkt. 331 ¶¶ 307–08.

On March 16, 2014, Doe traveled to Palm Beach and then to Epstein's ranch in New Mexico. Dkt. 315 ¶ 162. Doe says that while in New Mexico, Epstein went in her bedroom while she was sleeping and digitally penetrated her. Dkt. 331 ¶ 309.

A few days later, Doe flew to Vancouver, Canada, to attend a TED Conference, and then to Seattle, Washington, to meet Bill Gates. Dkt. 315 ¶¶ 163, 165. (Doe says that Epstein facilitated these events to "keep up the ruse that he was going to help her with her career." *Id.*). After she left Seattle, she returned to New Mexico, where she saw Epstein for the last time on March 20, 2014. *Id.* ¶¶ 166–67. She flew to New York on March 21, 2014, and returned to ▬▬▬ on March 24, 2014. *Id.* ¶¶ 168–69.

Doe ultimately received $2,500 from Epstein, which defendants say was compensation for her work as Epstein's personal assistant over these few weeks, and Doe says was "part of the ruse that Epstein sold to her and was intended to keep her quiet and complicit in his sex trafficking operation." *Id.* ¶ 172.

On March 13, 2024, Doe sued defendants for participating in a sex-trafficking venture in violation of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1591(a)(1), 1595; benefiting from a sex-trafficking venture in violation of 18 U.S.C. §§ 1591(a)(2), 1595; violating the New York City Victims of Gender-Motivated Violence Protection Law (GMVPL), N.Y.C. Admin. Code §§ 10-1101 *et seq.*; battery; and intentional infliction of emotional distress. 24-CV-2192, Dkt. 1-1 ¶¶ 66–104.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a fact is "material" if it could "affect the outcome." *Id.* The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## DISCUSSION

### I. Summary judgment is granted on Doe's common-law state claims

The parties agree that Doe's state-law tort claims are untimely. But they dispute whether defendants should be equitably estopped from asserting that defense.

As an initial matter, defendants point out that doctrine of equitable tolling "is not available in state causes of action in New York." *Jane Ho Choi v. Beautri Realty Corp.*, 22 N.Y.S.3d 431, 452 (1st Dep't 2016). In this case, "the applicable doctrine is equitable estoppel." *Ari v. Cohen*, 968 N.Y.S.2d 31, 32 (1st Dep't 2013).

"The doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense." *Zumpano v. Quinn*, 849 N.E.2d 926, 929 (N.Y. 2006). Under New York law, it is unjust to allow a defendant to assert this defense "where [the] plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Id.* (quoting *Simcuski v. Saeli*, 377 N.E.2d 713, 716 (N.Y. 1978)).

Additionally, "fear of retaliation has been recognized as a basis for equitable estoppel in at least one context: litigation by prison inmates under 42 U.S.C. § 1983." *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 173 (S.D.N.Y. 2019). "Outside of those unique circumstances, however, New York law strongly disfavors equitable tolling based on fear of retaliation, except where duress is an element of the cause of action." *Id.* And "[f]ear of harm to a plaintiff's career cannot justify equitably estopping a defendant from asserting a time limitation period." *Id.* (alteration in original) (quoting *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1318 (S.D.N.Y. 1997)).

On summary judgment, the Court must determine whether "a reasonable district court acting in a fact-finding capacity could determine that the prerequisites to equitable [estoppel] . . . are present on th[e] record." *Doe v. United States*, 76 F.4th 64, 71 (2d Cir. 2023). The Court concludes it could not.

"It is . . . fundamental to the application of equitable estoppel for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit." *Zumpano*, 849 N.E.2d at 929. Doe fails to point to any "subsequent [or] specific actions" here. Her abuse occurred in 2014. Her final contact with Epstein occurred in 2015. 24-CV-1204, Dkt. 315 ¶ 180. Epstein died in 2019. *See* Dkt. 255-51 at 250. Yet Doe did not sue until 2024.

Doe argues that she "has adduced evidence demonstrating that Epstein employed threats and manipulation tactics that, combined with the psychological impact of Epstein's emotional, physical, and sexual abuse, prevented Doe from bringing this action within the limitations period." Dkt. 304 at 5. Additionally, Doe argues that she "and other victims of Epstein feared that they would face physical violence if they were not compliant with Epstein's demands." *Id.*

Doe points to her deposition, in which she explained that Epstein commented on Doe's clothes, hair, and nails, Dkt. 255-51 at 350–51, and threatened Doe that he would reveal the abuse, *id.* at 347–48. Doe says that Epstein ultimately "broke[] [her] down . . . mentally." *Id.* at 349. And in a sworn declaration submitted in opposition to defendants' motion for summary judgment, Doe also says that "[d]ue to Epstein's abuse, for years, [she] was fearful that if [she] spoke out against Epstein[,] [she] would face physical[] violence because of the threats he made to [her] and other females he abused." Dkt. 310-44 ¶ 5.

These facts do not suffice for equitable estoppel under New York law. Doe does not describe any "subsequent and specific actions by [Epstein]" that kept her from suing within the limitations period. *Zumpano*, 849 N.E.2d at 929.

Although in the context of equitable tolling, the Second Circuit has "recognized that the psychological impact of long-term or extreme sexual abuse can constitute an extraordinary circumstance that prevents a victim from coming forward even for some time after the abuse has ceased," *Doe*, 76 F.4th at 72, Doe offers no argument that this same principle applies in the context of New York's doctrine of equitable estoppel. Indeed, in *Zumpano*, the Court of Appeals rejected the application of equitable estoppel to claims by victims of child sex abuse. *See Zumpano*, 849 N.E.2d at 930 ("No new separate and subsequent acts of wrongdoing beyond the sexually abusive acts themselves are alleged, and equitable estoppel is therefore inapplicable to these cases.").

New York ultimately enacted a separate statute—the Adult Survivors Act (ASA)—to address sexual-violence claims that might be time barred. The ASA, which became effective on May 24, 2022, revived time-barred claims related to "sexual offense[s]" and provided a one-year lookback period for victims to sue, which began six months after the law became effective and ended on November 24, 2023. N.Y. C.P.L.R. § 214-j; *see also* Victoria Nourse, *The Common Law's Resistance to Gender Violence*, 110 Iowa L. Rev. 167, 220 (2024) ("Lookback windows are similar to and possibly evolved from . . . the doctrine of equitable estoppel."). In passing this law, the New York legislature explained that "[t]hose who have had justice denied them as a result of New York's formerly insufficient statutes of limitations should be given the opportunity to seek civil redress against their abuser or their abuser's enablers in a court of law." *Senate Bill S66*, N.Y. State Senate, https://www.nysenate.gov/node/8080937. So even though Doe's claims expired at the latest five years after her abuse in 2014, she had another chance to sue from November 24, 2022, to November 24, 2023.

There is no justification in the record for Doe's failure to sue during this lookback period. Although Doe says that fear of Epstein's wealthy and powerful network (including her former mentor) kept her from doing so, there is no evidence that any member of Epstein's network took any action toward Doe. Doe points out that she did not "sever ties with ▮▮▮▮ until 2023," *see* Dkt. 304 at 7, but beyond a few mentions in her deposition testimony that ▮▮▮▮ encouraged her to stay in touch with Epstein in 2014, Dkt. 255-51 at 293–94, there is no evidence that ▮▮▮▮ coerced Doe or prevented her from filing suit, particularly after Epstein's death in 2019. Moreover, Doe participated in litigation by Epstein victims against Deutsche Bank in 2023; it's unclear why she would be able to participate in that case but unable to file her own suit. *See* Dkt. 315 ¶¶ 185, 191.

In sum, absent a "pattern of continual and egregious acts of intimidation," "fear of retaliation does not toll the statutes of limitations for the duration of a famous defendant's power and influence, even for the most despicable wrongs." *Geiss*, 383 F. Supp. 3d at 175. Accordingly, Doe's equitable-estoppel arguments fail.

## II. Summary judgment is denied on the TVPA claims

### A. Commercial sex

Next, defendants argue that Doe's TVPA claims fail because she "admits that she received nothing of value in exchange for sex." Dkt. 264 at 5. To succeed on her TVPA claims, Doe must prove that Epstein used "force, threats of force, fraud, coercion . . . or any combination of such means to cause [Doe] to engage in a commercial sex act." *See* 18 U.S.C. § 1591(a)(2). The statute defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." *Id.* § 1591(e)(3).

Doe admits that in 2014, she didn't understand that the money Epstein gave her was in exchange for sex. *See* Dkt. 255-51 at 171–72. But she says it doesn't matter. In Doe's view, it's enough that "[t]he record reflects that Doe received value in the form of free accommodations, travel, [and] meetings with wealthy and powerful individuals," and the "value" Doe received "was on account of the sexual acts that Epstein subjected her to." Dkt. 304 at 10. In other words, Doe says, "[i]t is irrelevant that Doe did not personally perceive the payments or career opportunities to be in direct exchange for sex." *Id.* at 11.

The Court agrees. The TVPA is a remedial statute that should be broadly construed. *Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y. 2018). "Commercial sex act" is defined with "[b]road, expansive" language as "*any* sex act, on account of which *anything* of value is given to or received by *any* person." *Id.* at 515, 520 (quoting 18 U.S.C. § 1591(e)(3)). "[T]he use of the phrase 'on account of which' suggests that there merely needs to be a causal relationship between the sex act and an exchange of an item of value." *United States v. Marcus*, 487 F. Supp. 2d 289, 306 (E.D.N.Y. 2007), *rev'd on other grounds*, 538 F.3d 97 (2d Cir. 2008), *rev'd*, 560 U.S. 258 (2010). "The coexistence of the sex act and the thing of value is the exchange necessary to satisfy a commercial sex act"; there need not be a "bargained for exchange." *Roberts v. eXp Realty, LLC*, 2024 WL 3005892, at *4 (C.D. Cal. May 23, 2024). Nothing in the caselaw, nor in the statutory text, suggests that the victim's subjective view of *what* she was paid for is dispositive; indeed, if anything, the focus of § 1591 is on what the abuser knew or intended. A sex-trafficker may tell a victim that payments are being made for something other than sex, and the victim might in the moment believe him. But the truth might be that the payments were in fact for the victim's compliance with the abuser's sexual wishes. These instances are covered by § 1591.

At this stage, there is a genuine dispute about whether Epstein provided money, as well as career and travel opportunities, to Doe "on account of" the sex acts he forced her to engage in. Indeed, as multiple courts in this district have held, the TVPA extends to "enticement of victims by means of fraudulent promises of career advancement, for the purpose of engaging them in . . . non-consensual sexual activity." *Geiss*, 383 F. Supp. 3d at 168; *see also Noble*, 335 F. Supp. 3d at 516 ("[C]ourts have applied section 1591 to defendants who have lured women, under false pretenses and with lucrative promises, for sexual purposes."); *Ardolf v. Weber*, 332 F.R.D. 467, 473 (S.D.N.Y. 2019) ("[S]ince the rise of the #MeToo movement, victims of 'casting couch' sexual

5

abuse and assault increasingly rely on the TVPA to prosecute alleged perpetrators . . . ."). Doe is right that this case is no different.

### B. Timeliness

Defendants argue that Doe's TVPA claims are also partially time barred. The TVPA provides that a claim is timely only if it is "commenced not later than . . . 10 years after the cause of action arose." 18 U.S.C. § 1595(c). Defendants argue that because Doe did not file this action until March 13, 2024, she cannot claim damages related to conduct that occurred before March 13, 2014. Doe responds that her claims are timely under the continuing-violation doctrine or because equitable tolling is appropriate.

The Court agrees with Doe that the continuing-violation doctrine applies and so does not reach the equitable-tolling question. "The continuing violation doctrine provides that '[w]hen a plaintiff experiences a continuous practice and policy [that violates his or her rights], . . . the commencement of the statute of limitations period may be delayed until the last [violation].'" *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018). The doctrine "applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation[],' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alteration in original) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)). "[W]here the continuing violation doctrine applies, the limitations period begins to run when the defendant has 'engaged in enough activity to make out an actionable . . . claim.'" *Id.* (alteration in original) (quoting *Morgan*, 536 U.S. at 117). For example, the doctrine often applies to hostile work environment claims under Title VII, which require that "[t]he alleged conduct . . . be repeated or ongoing before it is adequately severe or pervasive to constitute a violation." *Id.*

Doe points out that "[c]ourts have held that [the TVPA] involves a continuing tort, and that a single act occurring within the limitations period will preserve a claim based on all acts that were part of a single pattern." *Schneider v. OSG, LLC*, 2024 WL 1308690, at *5 (E.D.N.Y. Mar. 27, 2024) (collecting cases). Defendants argue that this case is different because it is not "based on continuous involuntary servitude or long-running abuse in which a victim remains under the physical control of an abuser." Dkt. 330 at 7. The Court disagrees. Whether and when a "victim escapes from the grasp of their traffickers" does not control accrual of a TVPA claim. *See Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 671 (S.D.N.Y. 2024). Instead, "[a] claim accrues 'when the plaintiff has a complete and present cause of action.'" *Id.* at 670 (quoting *Gabelli v. SEC*, 568 U.S. 442, 448 (2013)). Because the TVPA "involves a continuing tort," TVPA "claims accrue on the last date the wrongful conduct occurs." *Id.* (citations omitted). Here, the last date of defendants' wrongful conduct was March 16, 2014, so Doe's claim accrued on that date.

### III. Summary judgment is granted on the GMVPL claim to the extent it is premised on abuse that occurred outside of New York

Finally, defendants move for summary judgment on Doe's GMVPL claim to the extent that it is premised on conduct that occurred outside of New York. The parties agree that the GMVPL "applies only to conduct occurring in New York City." *Bensky v. Indyke*, 743 F. Supp. 3d 586, 602 (S.D.N.Y. 2024). Defendants argue that Doe "is not entitled to sustain her [GMVPL] claim to the extent she seeks damages premised on acts that occurred" outside of New York. Dkt. 264 at 9. Doe doesn't dispute this, arguing only that her GMVPL claim survives because she alleges that some abuse occurred in New York. In sum, the parties appear to agree that Doe's GMVPL survives, but Doe may only seek damages related to abuse that occurred in New York.

### CONCLUSION

For these reasons, defendants' motion is GRANTED IN PART and DENIED IN PART.

The Clerk of Court is directed to terminate ECF No. 252 on docket 24-CV-1204.

SO ORDERED.

Dated: September 18, 2025
New York, New York

ARUN SUBRAMANIAN
United States District Judge